Please the court, my name is Arthur Tellegen, I'm here with Robert Fisher, represent Thryv, Inc. About three quarters of a century ago, Congress passed the Taft-Hatley Act, based on a number of dissatisfactions it had with the Wagner Act that was passed in 1935. One of the perceived dissatisfactions was that the Courts of Appeals had given only void decisions in applying what was then the substantial evidence requirement, it was perceived at least that the NLRB would cherry pick the record and issue decisions where they were not supported by the record as a whole. Could you speak up a little bit? I'm sorry, Your Honor, I'll try. It's a... I missed it. Is that better, Your Honor? Hopefully. Okay, I'll try loud. The Taft-Hatley Congress, therefore, required that the Court review the record to make sure that it was based on substantial evidence on the record considered as a whole. Shortly thereafter, the Supreme Court, in the universal camera case, amplified the general proposition. It said that the Court must satisfy itself that the Board's order rests on adequate proof. In fact, Justice Frankfurter instructed the Courts to make sure and to ensure the reasonableness and fairness of the Board's decisions. In addition, the Court also addressed the role of the ALJs and the hearing examiner's decisions and instructed the Board that it must give weight to those decisions. If it's not going to follow them, it should explain why. This Court has repeatedly followed universal camera and forced the Taft-Hatley Act and required the Board to make certain that its decisions were based explicitly on the record as a whole. Most recently, in the Court's decisions in Dish Network and STP Nuclear, the Court found the Board lacking in very certain terms. This case. Most of the underlying facts are actually undisputed. Thrive is a company based in Dallas. It's probably the last in a line of directories companies. In 2019, it was trying to pivot to become a SaaS, a software company. This business force was losing, year over year, double digits. The union, the IBEW 1269, had four full-time officers to assist a bargaining unit of approximately 80 people. When Thrive's predecessor acquired a company called YP in 2017, it immediately recognized the union as bargaining agent, immediately adopted the then-existing collective bargaining agreement, and hired all the employees. There was no allegation, there's no shred of evidence in this case that Thrive in any way has animus toward the union or violated the act in any way other than as alleged in this case. In fact, the parties negotiated over the then-existing contract starting in 2017 well into 2018 when the company finally declared impasse and implemented its then last, best, and final offer. Judge Jones, if you'll permit me, that's LBFO and we all use that nickname, I'll try to stay with it. The union challenged the lawfulness of the company's implementation. It was reviewed by the regional director of Region 20 of the NLRB. She said it was a genuine impasse with opinions in the record. The union appealed to the general counsel of the National Ag Relations Board who confirmed from his perspective it was a valid impasse, it was a valid implementation. As a matter of fact, as of the fall of 2019, everybody involved in this case, including the general counsel, understood it was an impasse and understood that to the extent the company was going to do layoffs, the layoffs would be governed by Article 30.2 of the implemented LBFO. The company had business advisors, salesmen, generalized salesmen, and new business advisors, people whose role was to sell to new customers. As of its events in this case, there were six new business advisors. A year before the layoffs, the parties then in negotiations discussed the new business advisors, sometimes called on the record DSEs, name changed, the role was the same, it was to sell to new customers. In 2018, when the parties discussed the matter, it was clear that the new business advisors were failing, it was clear that, and this is from both parties' testimony, it was clear from the circumstances that something had to be done, and it was also clear that both parties investigated and determined there wasn't enough revenue being done by the regular business advisors to absorb these people. Several months passed by, the record is undisputed that the company is still losing revenue, the work being done by the regular business advisors is still diminishing, their bags of business as it is in the trade were getting smaller, and the new business advisors were failing miserably. Undisputed testimony that the revenue there was being handled, the ALJ concluded the revenue being handled by the new business advisors did not even support their base salaries. In July of 2019, the company started having internal discussions about what to do about the business advisors and formulated a plan, at least a conclusion, formulated a decision to terminate, to lay off those business advisors, and when I say a decision, businesses make decisions subject to negotiation, when they're unionized, they have a plan, they have an intention to lay off. So on August 21st, 2019, the company sends a letter to the union saying we are going to have a force adjustment, and you have 30 days to come in and discuss with us that force There was no restriction on the invitation, there was no saying we'll negotiate over the effects of the decision or the decision itself. The union receives that communication, and the parties attempt to schedule a meeting, company says we're available on September 4th and 5th, the union says no, we can't do that, we can meet on September 6th, and then after the company says okay, September 6th, the union says we can't meet until September 11th. I want to pause here. The union was aware of all the facts I recited to the court. Revenue going down, new business advisors failing badly. And no obvious way to have them become integrated into the business advisor role that had been discussed in the situation, and to reject it a year earlier, and in fact, circumstances on the ground were just getting worse. Now, faced with 30 days to negotiate something, any responsible union would have made haste. It would have prepared proposals either on the decision or the effects on something. It would have, if it required information to make those proposals, it would have immediately gone to the company and said hey, we need this information to make those proposals. Between August 21st and September 11th, three weeks into the 30-day period, the union did nothing. It prepared no proposals, made no information requests, it did nothing. Now, when the parties showed up for bargaining on September 11th, the union, according to the administrative law judge, did everything but make a proposal. It talked endlessly about whether the company's actions complied with the last, best, and final offer or not, and you'll find in the record this ongoing theoretical debate whether the company was laying off all six new business advisors or eliminating the channel, and that goes on endlessly during this meeting and throughout. It talks about several other violations, alleged violations of the last, best, and final offer, and most strikingly, it demands from the company a proposal in order for it to make a kind of proposal, and the company's representative said repeatedly, and this goes on throughout all of the bargaining, no, you have our letter, our proposal is we're laying off those people, the benefits they get are laid out in Article 30, if you have a kind of proposal, make one. The union never did. It said you can't do what you're doing. It said that you're violating the last, best, and final, so stop doing it. There was never a proposal. I return to universal camera and this court's case law. The administrative law judge heard six days of testimony. Four of those days were consumed by the testimony of the union's principal negotiator, the person who spoke most at the meetings. He reviewed, we took, actually brought to record, Your Honor, lots of paper, and he concluded that the company bargained in good faith, that the union made no proposals, no proposals that were comprehensible to this proposal. I digress for one second. The board's analysis of this case was if there was a haystack filled with the straw of asides, all kinds of stuff being said by the union's negotiator, and in that haystack is one needle of proposal that, well, see it as a proposal and the parties are really bargaining. No, one thing the company ought to have is a proposal that's reasonably identified as a proposal. Now, a party is not required to put all its proposals in writing, but it is required to make sure that the other side knows what's a proposal, and it did not appear to be a proposal, and that's when the decision is made, and that's when the decision is decided. The board's decision makes up facts. It twists facts, never does what this court and the Supreme Court and the Taft-Outley Congress instructed to do. May I finish my sentence, Your Honor? Senior Renly. All right. Well, you can conclude. Your time is up. It has . . . the board has disobeyed all those things. What happened was plain to the ALJ, who saw all the witnesses, who read all the records, scrutinized the bargaining minutes, and the board has not complied with its obligations. I apologize for running over. That's okay. You have a chance for rebuttal. Thank you. Mr. Weitz. Good morning. May it please the Court. Eric Weitz on behalf of the National Labor Relations Board. In agreement with my colleague today, I would submit that this case is a straightforward application of universal camera and the substantial evidence standard of review. The law here is largely undisputed, both before the board and this court, and the question before the court then is, does substantial evidence in the record support the board's findings? But there are key findings, which the employer simply ignores, that are dispositive in this case. First, it's well established as a legal principle under the statutory duty to bargaining good faith that an employer, before it implements a change unilaterally, it has to engage in the give and take good faith collective bargaining. That's why there is the fait accompli doctrine that an employer cannot begin to implement a change or treat it as decided before that statutorily mandated bargaining process occurs. But that's exactly what occurred here. Why was the ALJ wrong in finding otherwise? Well, the ALJ found that even if there was a fait accompli, it was cured, which I can get to in a moment. I don't think the ALJ disagreed with the preliminary finding that this was implemented, or the employer began to implement this before it even met with the union. I don't understand that at all. Let's go way back, because I'm very confused by the whole brief that you filed is about unilateral changes and unilateral implementation. I take it the board's view is that Article 30 of the LBFO did not control the termination decisions. But the general counsel in response to a charge filed about the LBFO years before any of this happened said, and I'm quoting the general counsel's decision, quote, there is no evidence that continued bargaining would have been fruitful, and the employer was privileged to implement the terms of his last, best, and final offer, and such implementation did not violate the act. That's not their position, right? That's the general counsel's position. No evidence. So on your view of universal camera, however differential substantial evidence review is, no evidence is no evidence. And so I don't understand how we can even, even if we wanted to entertain any of this stuff, it strikes me that we are bound to say there is no evidence of any fruitful negotiations prior to the implementation of Article 30 in the LBFO, and so the entire case hinges on whether they complied with Article 30 of the LBFO. Help me understand how that's wrong. Well, yes, certainly, Your Honor. There's two separate issues. There's an initial question of when impasse was declared in 2017, was that a lawful declaration of impasse, and was the LBFO lawfully implemented? As to that, the board's general counsel did find insufficient basis to issue a complaint. However, I would note that the general counsel does not control the board. The board is the ultimate finder of fact, and as this Court has held, a general counsel dismissal is not res judicata as to that question. However, that question is not controlling in this case. The board noted that the employer had failed to prove that that was lawfully implemented, which I would submit is a threshold barrier, but the board went on to say even assuming that the LBFO was lawfully implemented, that does not grant, that does not mean Article 30 is a legitimate implemented proposal. So I have a question about that second piece, but can we focus on the first one for a second? Because I agree with you it's a threshold question, and it does seem like if it doesn't decide the entire case, it decides like 95 percent of it as to whether Article 30 was lawfully implemented. And what I don't understand, I mean, the whipsawing of the employer in this case is staggering, right? Because they go through this whole proceeding. They have an unfair labor charge filed against them. They get it dismissed, and then they win in front of the ALJ as to the lawfulness of the terminations in accordance with Article 30. The very beginning of this entire case, the answer to the complaint says, we complied with Article 30, right? You have all this stuff in your brief about, oh, well, they waived this, and they forfeited that, and we didn't have fair notice of their arguments, when it's almost like Alice in Wonderland, right? I mean, in the answer to the complaint, they say, we complied with Article 30, right? And then they're the ones that get whipsawed, turned totally back, upside down, right? Where it's like now, stuff that was long dead, long gone, long settled, everyone's agreed as to the impasse and the implementation structure, Article 30, LBFO, then it comes back resurrected like the, you know, cardinal, the phoenix, right, rising from the ashes. And then they get hammered for them somehow forfeiting something. I'm just, I want to get to your second point about whether and to what extent you can, in fact, use an LBFO structured like Article 30 is. That's important. I agree with you. But I'm still struggling about how we get through any of the sort of procedural machination to that point. It's certainly, Your Honor. I mean, I don't want to belabor the point too much, because I can tell Your Honor isn't totally convinced by the board's analysis, finding that it wasn't presented in the acceptance to the board, which is the controlling document. But I just reiterate that the board explicitly said, number one, it wasn't presented. But quickly moving aside, even assuming that this is a lawfully implemented LBFO, we're going to go on to our substantive analysis. So I don't think it actually really has any impact in this case. I think the main dispute is as to the second part, which is we all assume this was lawfully implemented. Does that grant the employer the right to do this? And that's the second point I'll turn to, which is under board law, the board has a very well-established doctrine which has not been disputed by the employer before the board or this court, which holds that employers cannot unilaterally implement these types of clauses, which in the future, they're retaining the authority to do things unilaterally. That's not the point of the impasse doctrine as the Supreme Court has described it. The point of the impasse doctrine is when you've reached a deadlock in bargaining, the employer is allowed to implement terms at that moment. But the bargaining relationship is not severed. That doesn't grant the employer a continuing right to do whatever it wants. So certain types of these kind of management rights clauses, board law is clear, cannot be implemented. But I don't know if this court has affirmed that, but I also think that's irrelevant in this case because if you look at this court's Raven Services opinion, that was a case where the court noted that there was some disagreement between whether employers can implement these types of management rights clauses. But if the impasse has been broken, as the board found that it had here, and the parties have resumed bargaining in some sense, this court has also affirmed, based on slightly different reasoning, that an employer cannot rely on a management rights clause that implemented a year earlier. So I think under either version of the test, which I don't think the court needs to resolve in this case, this is a situation where the employer just cannot invoke a unilateral implemented clause as if it was a contract. Certainly, the parties could have agreed to Article 30 in an executed collective bargaining agreement, and the union could agree to that and give up its right to bargain over layoffs. But in the absence of a contract, all you have are unilaterally implemented terms, which are a different creature under the law. And so that's why, even if we assume that the LBFO was lawfully implemented, that impasse was lawful in 2017, I don't think it impacts this case or the board's analysis, setting aside that threshold procedural question. So I heard several things in that. I wanted to kind of tease them out. So number one, I take it that it's common ground that an LBFO can, in fact, include management rights clauses. There's nothing in general. We can dispute whether this one's a valid one, but there's nothing in our precedent, D.C. Circuit precedent, or even board law, as far as I understand, that prohibits management rights clauses generally. Is that fair, right? Well, I think board law does prohibit them, Your Honor. Oh, totally. Depending on what we mean by management rights. I think board law is saying when you implement an offer, as part of that, you can't implement a waiver of the union's rights. So you could implement a layoff at the time, if that was part of the offer, but you can't implement a continuing clause, which then says one year later, when we decide that a layoff's necessary, we don't have to go to the union, because that's not the point of the impasse doctrine. And I guess the thing I don't understand is what is the principle, if that's true, I don't understand what is the sort of legal vitality of the principle that the LBFO governs from the moment of its imposition, again, we're now to the point where we're assuming it was imposed lawfully in 2017, from its moment of its imposition to whenever it gets replaced by a written agreement, by a new negotiation. I mean, the whole point of it, right, is that it governs not just on the day of its implementation, but also for some duration into the future, and we can debate how long it goes. But I take it you're saying that, no, it basically governs in one snapshot in time, and then it just, but it can't have any future effect? Am I understanding the point? Well, to the extent it involves a waiver of rights, because really the point of the impasse doctrine is not, you're not imposing a contract, you're imposing terms. So you can change the wage rate, you can reset the benefits, and you can change all terms and conditions of employment in the bargaining unit, which you otherwise couldn't do. And the point of that doctrine is that when the parties have reached valid total impasse and they're at a complete deadlock, it's supposed to sort of jumpstart bargaining and try to encourage the parties to get back to the bargaining table so the union has more of an incentive to make concessions or to agree to things immediately. So as the Supreme Court has explained in some of its cases describing this doctrine, it's not a severing of the bargaining relationship in perpetuity. It's something you impose at the moment of impasse with the hope that the parties get back to the bargaining table as soon as possible and fulfill the statutorily contemplated process. And so the reason for this doctrine under board law is if you're not imposing a term like a layoff as part of that offer and you're just saying, well, this term that we could have had in a contract says whenever we decide a year from now if we want a layoff as a completely new unilateral change, the National Labor Relations Act still applies at that point. But if I'm understanding your answer, if they had said we're firing six NBAs today in 2017, that's fine because that's a valid LBFO. Correct. It's just you can't say, you can't be more favorable to the union and to the employees by saying, listen, we would love to keep you, right? Here's our LBFO. In the future, we may have to fire you. And if we do, here are the procedures that we're going to follow. I mean, it is kind of a weird result, right, that somehow they're worse off by giving an extra year of employment, extra 30 days, the severance payments, et cetera, all the stuff promised in Article 30 than they would have been if they had just said, too bad, too sad, you're gone. Well, I don't think it's more favorable, Your Honor, because the problem with allowing employers to do this is that it removes any incentive for the employer to return to the bargaining table because they essentially have thrived in this case. They can say, this is our last, best, final offer. We're conferring to ourselves the rights to do anything unilaterally in perpetuity, and we can just ignore the union for as long as we want. Let me, I mean, but why did nothing happen in these 30 days? Well, Your Honor, that's an important point. I mean, that was an offer to come and discuss, at least discuss the layoffs, right? Yes, Your Honor, and I think that's an important factual point, which my colleague did not, I would disagree with his characterization of the facts. Number one, the employer decided that it was going to eliminate these positions in or around at the latest. It did not notify the union at all. It waited until this 30-day deadline. Well, you know, when you keep losing money at that rate, I mean, everybody ought to be preparing their bailouts, but leave aside common sense. They did get 30 days notice. The union got 30 days notice, and it didn't do anything. Well, that's not true, Your Honor. So on August 20th or 21st, notice was given to the union. That started this 30-day clock. The employer then said the earliest we are available to meet is two weeks from now. It was the employer that initially imposed this two weeks of delay. The union said we're not available on that date. Both parties mutually agreed to a date just one week later from what the employer was meeting on September 6th occurred, that the board's basing its beta complete finding on, where the employer went ahead and said, you know, we're holding the meeting with employees. We're telling them they're being discharged, and we're sending out severance packages. That was two days after the earliest date that the employer gave. But the union could have come forward at any time. Well, no, Your Honor, because the employer was saying to the union, we cannot meet before face-to-face is one thing, but they still could have filed something in writing. Well, that's not the process that the statute contemplates, Your Honor, to have good faith bargaining. Bargaining is bargaining. Well, bargaining is bargaining, but you cannot put all of the impetus on the union before having heard anything from the employer to come up with a final proposal before an initial meeting. There needs to be a give and take. There needs to be a meeting between the employees, and also, a critical fact in this case, there needs to be information provided by the employer to the union, which simply never occurred in this case. The employer has consistently said that there wasn't revenue available to absorb some of these positions. Is there any reason to doubt that? There is, Your Honor. For example . . . That the yellow pages were actually contrary to all, you know, public knowledge that they were actually thriving? Well, Your Honor, I would submit that's in the record as well. Thrive generates more than a billion dollars a year in revenue, but as to your specific question, I'd point the Court, for example, to a record on appeal, page number 3708. That's an internal email between Thrive managers, which was never provided to the union, where Thrive managers are saying, we just transferred this NBA that we like, Luis Pantojo, to a BA position because we have so much revenue available in Northern California. So there simply is no evidence in the record to support these repeated assertions that there wasn't revenue available, and certainly, the union never had that during the bargaining process, which is critical information for the union to know what the facts are and to formulate detailed counterproposals. But notwithstanding the lack of information, I'd also dispute the characterization and the finding that the judge made that there weren't any proposals. I would just direct the Court to the bargaining notes. There are both the bargaining notes of the union and the employer in the record, and while the union didn't have a detailed counterproposal, it offered a proposal just as detailed as what the employer was saying, which is that we need to delay this. We need to talk about absorbing all or even some of these NBAs into BA positions, which is already a concession, and the union was making detailed proposals, which Thrive simply did not like, and Thrive was presenting this as a take it or leave it. We've decided we're going to do this on September 20th, and in fact, they had already put the wheels into motion before any of these meetings even occurred. Because of this critical meeting on September 6th, I would direct the Court to Record on Appeal 3833, which is the verbatim transcript of what was told to employees. I think I would submit to the Court that that's unambiguous, that this was being treated as a final decision and presented to employees as such. I'd also direct the Court to Record on Appeal 3771-80, which is an example of one of the letters, severance packages that went out to employees before the first meeting with the union had even taken place, and once again, that's unambiguously stating that this is a final decision that's already been implemented. I see that I'm over time, so if the Court has no further questions . . . Well, just an empirical question. How often is it that the Board overrules both the General Counsel and the ALJ? Well, the Board didn't overrule the General Counsel. The facts of the impasse were never presented to the Board. All the Board said here was that we're not bound by the General Counsel's determination. Well, you know what I mean. Well, as to the ALJ here, it's not . . . Just empirically, what's your best estimate? I would say it's very common, Your Honor, and particularly here where the Board . . . Most of those don't get to this Court for some reason. Well, I don't have a statistical answer, Your Honor, but I don't think it's rare, and I would note that, returning to the universal camera point, the Board owes no deference to the ALJ whatsoever with the limited exception of witness credibility determinations because the ALJ is in the room seeing the witnesses, but here the Board did not rely on witness testimony that was discredited. We solely cite in our brief the bargaining notes of both the union and the employer. We do not rely on any union representative's testimony. That was not the basis for the Board's decision. If the General Counsel finds no evidence, no evidence, that it was unlawful to impose an LBFO in 2017, the ALJ obviously finds no evidence. It was not before the ALJ. What could, theoretically, the Board rely on to find substantial evidence to hold the opposite from everybody else involved in this entire case? Well, the point the Board made here, Your Honor, is that it's the employer that's attempting to rely on the LBFO as a defense to what would otherwise be an unfair labor practice, and so the employer had the burden to establish that this was validly implemented, which would include presenting evidence at the hearing, but again, I'd just like to emphasize that if the Court disagrees with that threshold point about it not being presented, that it just does not impact the Board's analysis here because the Board said, even assuming this was valid, we're going to apply this second step substantive analysis. So if there are no further questions . . . No, thank you. Thank you. All right. Mr. Talegan? Oh, sorry, Union. Yes, sir. Mr. Aubrey. Thank you, Your Honor. Good morning. My name is Lucas Aubrey, together with my colleague, Jacob Demry. I represent the intervener in this matter, IBW Local 1269. Due to the questions from Judge Oldman on the LBFO, I wanted to start with that point, and I think the important point here is that the Board was not overruling the General Counsel's prior determination that Thrive properly implemented its last, best, and final offer at impasse. That issue was dead on appeal when the General Counsel's office says, yep, we don't see any evidence that there's no impasse. So the last, best, and final offer was in place at the time Thrive went about implementing these layoffs. But, but, subsequently, the impasse was broken, and it was broken for a couple of reasons. First, the parties were beginning to start to discuss negotiating a real agreement, not just a last, best, and final agreement, but a real agreement. And this Court said, has said in Gulf States Manufacturing and in other cases, that impasse can break in all kinds of ways. It can break with the passage of time, it can break because of a strike, it can break because of changes in lead negotiators, it can break because you see some movement from either party. So here, the last, best, and final offer, by the time Thrive actually implemented the layoff, was no longer controlling. In your view, when did the LBFO expire? What was the date? What was the date that the LBFO went poof? So I can't give you a date, right? This is, this is labor law, so lots of, lots of nuance here, right? But I can tell you that there were emails in July and August talking about bargaining for a new agreement. There is evidence in the record in this case that Thrive refused to provide information in response to the union's request for information. And this court in Raven Services said, if there's a unilaterally implemented management rights clause, and the impasse is subsequently broken, including by the employer's failure to provide requested information, the employer can no longer rely on that unilaterally implemented management rights clause. Suppose you were the general counsel to Thrive, and you're trying to figure out when, you agree, right? We all agree that Article 30 was lawfully imposed in 2017. But you're trying to advise the executives at Thrive when they can stop, or when they have to, I guess is a better way of saying it, stop relying on the management's rights clause in Article 30. When would you have told them to stop? I think the second that they refused to provide information the union requested, specifically with respect to the layoff decision. There may have been a date prior to that. If I'm the general counsel to Thrive, and my client refuses to provide information in the midst of bargaining over a layoff decision, I'm going to tell them, whoa, whoa, whoa, I don't think we can rely on Article 30 any longer. And remind me, what in Article 30 required them to answer those information requests? It doesn't. The National Employment Relations Act requires an employer to provide requested information. The board here found that the requests were relevant to bargaining over the layoff, and that Thrive refused to provide that information. So 8A5 of the National Labor Relations Act itself imposes that obligation on Thrive. Got it. I also want to just note, on the fait accompli point, I think my colleague from the board did a nice job of walking you through the facts. The critical fact here, honestly, is that Thrive went to the employees before it sat down, right? It put off meeting for two weeks. Instead of sitting down with the union first, it went straight to the employees, and it told them, we're going to lay you off. You're going to be laid off effective September 20th. We're putting severance packages in the mail. That all happened before they met with the union. And all five members, then sitting members, of the National Labor Relations Board, including the two members who dissented on the remedies issue, said that amounts to a fait accompli. And so there's more than substantial evidence in our view on that issue. I wanted to make, very briefly, one quick point on the remedy issue. So Thrive's challenge, the board's decision to include within its make-all remedy, remedies for direct or foreseeable harms, our view is that issue's not properly before the court at this time. The board, in its decision, listed the potential remedies for this case, but then it said, we reserve these remedial issues for resolution in the compliance stage of the proceeding. And then Judge Kavanaugh, in a D.C. Circuit decision, NLRB versus DuPont, explained that when the board makes such a reservation, the opportunity for review of the remedial issue is necessarily deferred until the board resolves the issue in a subsequent order in the compliance phase. So it's an important topic. It's not yet before you. Judge Jones, can I ask one quick follow-up? I just want to make, to go back real quick to that. I want to make sure you got out your point. But can we circle back to the fait accompli thing? Because I'm, quick question. If we said that Article 30 of the CBA was lawfully implemented, and if we couldn't find anything in Section 8 that would prohibit the implementation of Article 30, you don't get to the fait accompli issue, right? Like, because then you're just allowed to just, as long as you complied with Article 30, there's no, there would be no prohibition on imposing the LBFO, and there would be no prohibition on implementing the terms of it. Is that, in my understanding, you only get to the fait accompli thing if you jump both of those prior hurdles. That's right. But you must jump over those prior things. Yeah. Because Thrive took actions that broke the impasse and could no longer rely on its unilaterally implemented management rights provision in Article 30. Perfect. Thank you. All right. Thank you. Thank you, Your Honors. Now, Mr. Tilleghan, excuse me. I apparently wasted six days in 2020 trying a case because it was irrelevant. The General Counsel at the trial seemed to think that the LBFO was in place. There was not a shred of suggestion at that trial that the impasse had been broken and the LBFO was not in place. Now, in fact, there is no such evidence. There was no breach of, there was no breach in the impasse. But if there had been, you would have thought that either the Union or the General Counsel would have brought it to the attention of the Administrative Law Judge. The original charge in this case claims that the company violated the last, best, and final offer. It said, I'm sorry, it's obscurity. But it is in the record, I'll, we can send it to you. But it said, you're violating the LBFO. The Union's representative said over and over and over again, you're violating the last, best, and final offer. The General Counsel's lawyer said the LBFO's in place. The judge found the LBFO's in place. Now, the board does handstands and gymnastics to try to claim the LBFO's not in place. If this one wasn't in place, I don't know what it is. The answer to the questions you are asking, Your Honor, is that what happens when you implement lawfully an LBFO? You create a new status quo. And bargaining is required when you break the status quo. So as long as the company is complying with the LBFO, it's not broken the law. Counsel, are you aware of a case that says you're not allowed to impose, and I would take any case, but I'm obviously, I care mostly about the Fifth Circuit, that says you're not allowed to impose an LBFO that looks like Article 30? There is no such case, Your Honor.  I've looked and I can't find, I'm having, I'm struggling. What counsel was trying to tell you was that even if you implement the last, best, and final author, there are some restrictions in what you can do. The classic case is you can't implement a no-strike clause. Right. And I assume that comes from Article 7, right? Section 7, sorry. They could have struck, we could have locked out. The implementation of the LBFO didn't matter. Management rights clauses, if they are acted upon to change the status quo, may require bargaining. In this case, it's arguable whether declaring a layoff is or isn't a change in the status quo, but we bargained. And what's ironic about this case is we were bargaining and the union was refusing to bargain. And that's what the ALJ decided. And you won't find in the board's decision anything that even addresses what the union was doing at bargaining. Whether or not all would agree that what Mr. Guthrie was doing was trying to throw sand in the gears, which the ALJ concluded. If you come to a different conclusion, you ought to explain all that sand. And the board never did that. A couple of minor points. On their request for information. Whatever else is true, Your Honor, about precedent, you will never find a case that comes before you where the union had as much relevant information as this one did. As the ALJ found, it received all the market throws, as they're called. That's every account assigned to every salesperson. And what had happened to those accounts the year before? And what the revenue was attached to those accounts? On why the parties met first on September 11th. The company's email says verbatim, I'm available by conference call prior to our bargaining on September 4th and 5th about a different matter. Let me know the union's availability. It did not refuse to meet before September 4th or 5th. It was clearly entertained that the union said, we really have to get together sooner. What happened was the response to that email was, we'll meet on September 6th. The company said, OK, we'll meet on September 6th. And then the union said, oops, we can't meet on September 6th. We have to meet on September 11th. That's the first time we're available. Those are undisputed facts in the record, Your Honor. We can't say the company agreed to meet on September 11th or the company refused to meet before a certain date. I'm sorry. I thank the court. OK. Thank you very much. For further questions. Thank you very much for your attention. Thank you.